# Wytheville.

SIMMONS v. PALMER & OTHERS.

JULY 9, 1896.

Absent, Harrison, J.

1. RESCISSION—*Diligence—Case at Bar.*—Application to rescind a contract
on the ground of mistake should be made with due diligence, and
what constitutes due diligence must be determined by the facts of
the particular case. The diligence must be in proportion to the in-
jury likely to ensue from delay. In the case in judgment, though
the complainant negotiated for the purchase of lot 5 in section 16,
and there was conveyed to him lot 5 in section 15, and he promptly
called attention to the mistake and demanded a return of his money
and bonds, yet he was perfectly familiar with the land and its divi-
sion in lots and sections, and must have known of the mistake at
the time. The lots were bought for speculation, and it does not ap-
pear that they were of unequal value, or that the location of the
lot was the inducing motive to the purchase. The complainant kept
the deed and never offered to reconvey the lot until the lots had
greatly depreciated in value. These and the other attending facts
and circumstances present a case in which the complainant has not
been diligent, and is not entitled to relief by the rescission of his
contract.

Appeal from a decree of the Circuit Court of Roanoke
county, pronounced April 9, 1893, in a suit in chancery
wherein appellant was the complainant, and the appellees
were the defendants.

*Affirmed.*

The opinon states the case.

*G. W. & L. C. Hansbrough* and *M. G. McClung,* for the ap-
pellant.

*Arthur B. Pugh,* for the appellees.

KEITH, P., delivered the opinion of the court.

The facts out of which this controversy grows, as shown by the pleadings and proofs, are as follows:

S. F. Simmons, on the 6th of November, 1890, purchased of Armstrong, Critz & McClung, real estate agents at Salem, in Roanoke county, a certain lot of ground on Colorado street, in said town, for the sum of $2,000—$1,000 payable in cash, and the residue represented by notes payable by Hunton and Saunders to Ruff and by his notes to Palmer, which constituted liens upon the lot, the legal title to which was held by Palmer. It seems that the real estate agents had for sale lot five in section fifteen on the plat of the Salem Improvement Company, and offered that lot for sale to Simmons. Thereupon Simmons and Critz drove out to Colorado street, and when they came to lot five in block sixteen, Critz stopped and showed that lot to Simmons as the one which was the subject of negotiation, thinking that he was in fact showing him lot five in block fifteen, which was on the same street and about 100 yards further to the south. Simmons agreed to take the lot, and paid the $1,000 in cash, assumed the payment of the notes of Hunton and Saunders to Ruff, and executed his notes to Palmer, and a deed was executed to him for lot five in block fifteen. Immediately thereafter, with the deed in his pocket, Simmons drove out to inspect the lot, and discovered that the lot conveyed to him was not the lot which had been shown to him upon the occasion when he looked at it in company with Critz. He did not go back immediately to the office of Armstrong, Critz & McClung, but the next morning he saw Critz, and they drove out to the lot, and the mistake which had been made was pointed out. Critz did not controvert the fact that a mistake had been made. Simmons then went to see Armstrong,

another member of the firm, and said to him: "You have deeded me a lot which I have not bought. I bought lot five in section sixteen, and you have deeded me lot five in section fifteen, which I do not want, and you must take the lot back and deliver me my money and bonds." This is substantially the account given of the transaction by Simmons. Armstrong gives a somewhat different account of it. That lot five in section sixteen was shown to Simmons by Critz is beyond dispute; that the deed conveyed lot five in section fifteen is not denied; that the mistake was promptly brought to the attention of the real estate agents is established by the proof. But it appears by a preponderance of proof that Simmons accepted the 'deed and never offered to return it, although he demanded a restitution of the money which he had paid, and the delivery to him of the notes which he had executed. It further appears that Simmons had been the owner of this land for a number of years before he sold it to the Salem Improvement Company; that he was the vice-president of that Company; that he was thoroughly acquainted with the land and its subdivisions into streets, alleys, and lots. His acquaintance with it was so intimate that he says himself that it was altogether unnecessary for him to refer to the map, or to visit the lots, in order to know their location. Indeed, an inspection of the map exhibited in this cause will show that this must be so. Colorado street starts from Boulevard Roanoke, which cuts diagonally across the lands of the Salem Improvement Company. It runs almost due south from the old town of Salem. The sections beginning on the right, after leaving Boulevard Roanoke, passing into Colorado street, and going south, are numbered consecutively on the right from one to eight, then crossing Colorado street and coming back to Boulevard Roanoke, they are numbered consecutively from nine to sixteen, so that section sixteen would be the first section on Colorado street after leaving the old town of Salem, and section fifteen

is immediately beyond it, and upon the same side of the street. Therefore, no one in the least degree acquainted with the plat of the town could fail to discriminate between lot five in section sixteen, and lot five in section fifteen, or be ignorant as to their relative positions and advantages, without going upon either. The preponderance of evidence is that, at the beginning of the negotiations, the lot pointed out to Simmons on the plat was lot five in section fifteen. He therefore had every opportunity to know, and it is difficult to resist the conviction that he did know with perfect precision, the lot which was the subject of the negotiation, and which was described in his deed.

In coming before the court upon this state of facts and asking for a rescission of an executed contract where there is no imputation of fraud or imposition, the plaintiff puts himself at a disadvantage, for he was grossly negligent, if not wilfully blind, in failing to discover the mistake of which he now complains. The proof establishes beyond doubt that during November and December, 1890, and the spring of 1891, indeed, until some time in the summer of 1891, lots upon Colorado street in various blocks, some of them much further out from the old town of Salem than that in question, were readily sold for the price paid by the plaintiff for the lot purchased by him. Within the dates named the Salem Improvement Company, of which Simmons was vice-president, actually sold lots on Colorado street in sections four, five, seven, thirteen, fourteen, fifteen, and sixteen, at prices ranging from $2,000 to $2,300—the latest sale in point of time being the 21st of March, 1891, when lot twelve, section fourteen, was sold for $2,050.

In Pomeroy's Eq. Jur., section 856, in treating of relief upon the ground of mistake, it is said: "There are two requisites essential to the exercise of the equitable jurisdiction in giving any relief defensive or affirmative. The fact concerning which the mistake is made must be mate-

rial to the transaction, affecting its substance, and not merely its incidents; and the mistake itself must be so important that it determines the conduct of the mistaken party or parties. If a mistake is made by one or both parties in reference to some fact, which though connected with the transaction, is merely incidental, and not a part of the very subject-matter, or essential to any of its terms, or if the complaining party fails to show that his conduct was in reality determined by it, in either case the mistake will not be ground for any relief affirmative or defensive."

To the same effect it is said by Beach, section 52: " A mistake as to a matter of fact, to warrant relief in equity, must be material, and the fact must be such that it animated and controlled the conduct of the party. It must go to the essence of the object in view, and not be merely incidental. The court must be satisfied that but for the mistake the party complaining would not have entered into the agreement, or assumed the obligation from which he seeks to be relieved"; and the proof must be clear and convincing of the existence of the state of facts upon which the claim for relief is based.

In this case it is more than doubtful whether the location of the lot as between sections fifteen and sixteen was so material as that it can be said to have animated and controlled the conduct of the parties. There is every reason to believe that the purchase was made for speculative purposes. There was great activity in real estate in the town of Salem at that time. Lots were being rapidly disposed of, and it appears by the proof that, at the date of this transaction, and for several months thereafter, lots upon this street readily commanded from $2,000 to $2,300. But assuming that, upon the discovery of the mistake, Simmons was entitled to rescind the contract, the situation was eminently one which called for prompt and decisive action on his part. He

should have returned the deed at once, and demanded the restitution of his money and the cancellation of his obligations, growing out of this purchase.   But this he did not do, but as late as the summer of 1891, when one of the notes due upon this purchase was presented to him for payment, he objected to paying it, not upon the ground that he was not liable by reason of the mistake upon which he now relies, but because of the variance between the terms of the note and the recitals in the trust by which it was secured.   At this time the market for real estate in Salem had become dull, lots were falling in price, and in a little while transactions in real estate appear to have almost ceased.   Then, and not until then, this suit was instituted.   In the meantime he had held the deed, and was in a position to profit by the transaction had the lots continued to enhance in value, and he now seeks to be released from the purchase when the situation has so changed as that the other parties to the contract cannot be restored to their former position.

The application for relief in such cases, upon the ground of mistake, must be made with due diligence, and what constitutes due diligence is to be determined by reference to the facts attending the particular case in judgment.   The diligence required should be proportioned to the injurious consequences likely to result from delay.

As was said by Earl, J., in *Thomas* v. *Bartow,* 48 N. Y. 193: " In ordinary cases of tort and breach of contract, it is a fair and just rule which requires the injured party to use ordinary diligence to make his damages as small as he can, and confines his recovery to so much damages only as he could not by good faith and ordinary diligence have averted.   Much more, where a party comes into equity seeking relief on the ground of mistake, should he show that he has used due diligence and good faith to avert the consequences of the mistake ; and it would be a poor administration of equity that would give him relief after, by his delay and omission

of duty, he had caused irreparable mischief to the other party."

The decree complained of, dismissing the bill, is without error, and is affirmed.

*Affirmed.*